**LINQUATA v. UNITED STATES.**
No. 4312.

United States Court of Appeals
First Circuit.

March 9, 1949.

Writ of Certiorari Denied May 31, 1949.

See 69 S.Ct. 1157.

Harry Bergson, of Boston, Mass., for appellant.

W. Arthur Garrity, Jr., Asst. U. S. Atty., of Boston, Mass. (William T. McCarthy, U. S. Atty., of Boston, Mass., on the brief), for appellee.

Before M A G R U D E R, Chief Judge, WOODBURY, Circuit Judge, and CONNOR, District Judge.

WOODBURY, Circuit Judge.

The basic question on this appeal from a judgment sentencing the defendant to three concurrent terms of imprisonment, and fining him $1,000, is whether on the evidence taken as a whole the jury were warranted in finding beyond a reasonable doubt that the defendant had wilfully attempted to evade or defeat his income taxes for the years 1942, 1943 and 1944 by falsely and fraudulently understating his net income in the returns which he filed for those years as charged in a three-count indictment drawn under 26 U.S.C.A. § 145(b).

The defendant-appellant is a commercial fisherman who during the years in question was the captain of the fishing boat "Natalie III." During 1942 the boat, carrying a crew of nine including the captain, engaged principally in dragging for ground fish, and during 1943, and 1944, carrying a crew of fifteen including the captain, it engaged principally in seining for mackerel. When ground fishing the boat operated on what is known as the "60-40 lay", and when seining it operated on what is known as the "Italian lay." Under these systems of operation the costs allocable to each trip, such as the cost of the food, ice, and fuel consumed thereon, are first deducted from the gross proceeds of the catch made on the trip and then the balance remaining is divided proportionately between the owner of the boat and the men on board. On the "60-40 lay" 40% of the net proceeds of each trip go to the owner of the boat and 60% to the crew, including the captain, in equal parts, and on the "Italian lay" the net proceeds of each trip are divided into equal shares, one for each member of the crew, including the captain, and six for the owner of the boat. Thus when the "Natalie III" was seining, and hence operating on the "Italian lay", with a crew of fifteen men including the captain, the net proceeds of each trip were divided into twenty-one shares, one for each man on board and six for the owner of the boat, and when she was ground fishing, and hence operating on a "60-40 lay", with a nine man crew, each

man received about 7 percent of the net proceeds of the catch and the owner 40%. On the "Italian lay" the boat owner's share was obviously exactly six times that of a crew member, and on the "60-40 lay" the proportionate difference between the boat owner's share and that of a crew member was approximately the same.

In his returns for each of the years in question the defendant, who was on the cash-calendar year basis, reported a figure as his receipts as a crew member, and another figure exactly six times greater as his receipts as owner of the boat, and calculated his taxes on the sum of these two figures less his deductions. At the trial he testified that although he reported the entire boat owner's share of the catches made by the "Natalie III" as his own income, he was not in fact the sole owner of the boat but actually owned only a quarter of it, and received only a quarter of the owner's share. He said that he reported the entire boat owner's share as his because the person who helped him make out his returns advised him to do so for the reason that his father Marco, who owned half the boat, was aged, infirm, and could neither read nor write, and his nephew Thomas, who owned the remaining quarter was a minor. The defendant's tax adviser, however, testifying as a witness for the Government, denied this. He said that the defendant told him that he was the sole owner of the "Natalie III" and that he made out the defendant's returns on the basis of this information.

The Government takes the position that the defendant reported the entire boat owner's share as his income because in fact he was the sole owner of the boat, and then to prove that the defendant had understated his income for the years involved it introduced evidence of the payments made by various wholesale fish companies for the fish taken by the "Natalie III" during 1942, 1943, and 1944. Calculations from this evidence make it abundantly clear that the jury could well find beyond a reasonable doubt that if the defendant had in fact received the entire boat owner's share during the years in question, then he had grossly understated his income in his returns for those years. But from the Government's evidence it is equally clear that if the defendant had received during those years only one quarter of the boat owner's share, as he claims, then by reporting what he set out as the entire boat owner's share he in fact overstated his income for 1942 and 1943, and understated it only slightly for 1944. Thus the ownership of the "Natalie III" was one of the major issues at the trial upon which both sides introduced considerable evidence. But this issue is no longer in the case for the defendant now concedes that the jury had a right on the conflicting evidence introduced at the trial to find that the defendant was indeed the sole owner of the boat. His contention on this appeal is that even if the jury did find him to be the sole owner of the boat, that finding is not sufficient to warrant the inference that beyond a reasonable doubt he actually received the entire boat owner's share of the income, and that the court below in charging the jury that it had the right to draw that inference committed serious prejudicial error.

It is quite true that there is no direct evidence that the defendant actually received the entire boat owner's share of the net proceeds of the catches made by the boat during the years involved. The evidence with respect to the disposition of that share is as follows: It was the practice on the "Natalie III", when she came in from a trip and her catch was sold, for the crew member designated as the purser to take the check given in payment for the catch to a bank, have it cashed, and return on board with the proceeds. There the money was taken into the forecastle and in the presence of the crew, or at least of such members of the crew as wished to attend, the money necessary to defray the expenses of the trip was counted out and laid to one side, and then each man's and the owner's share, if on the "Italian lay", or percentage, if on the "60-40 lay", was calculated and counted out into separate piles.

The evidence is that the defendant was not often present in the forecastle when the proceeds of a catch were counted out and distributed. But his share as a crew member was usually, if not invariably, taken to him in the wheel house, or on deck, or wherever else on board he might happen to be, by some member of the crew. At any

rate he concedes that during the years involved he actually received all that was due to him as the captain and a member of the crew of the "Natalie III."

Apparently, however, neither the entire boat owner's share nor any part of it was ever delivered to the defendant with his share as a crew member. All that appears is that the purser of the boat sometimes delivered the boat owner's share to the bookkeeper of a wholesale fish company, who as a side line kept some records and books for the defendant, who deposited it in a checking account carried in a local bank in the boat's name, and sometimes the purser delivered it directly to the defendant's father. The evidence as to the ultimate disposition of this share by the defendant's father and from the checking account is fragmentary. There is direct testimony from the defendant himself that he received in cash one quarter of "the money that was taken to my father's house," and there is also evidence that from time to time he also received one quarter part of "splits", or distributions, made of the balance of the money remaining in the checking account after the payment therefrom of taxes on the boat and expenses incidental to its upkeep. Thus there is no direct evidence of actual payments to the defendant of more than a quarter of the boat owner's share.

The Government's contention that the defendant actually received the entire boat owner's share, however, does not rest, as the defendant contends, solely upon the evidence, which the jury evidently believed beyond a reasonable doubt, that the defendant was the sole owner of the boat. There is testimony in the record from two Internal Revenue officials that while the defendant was under investigation by them he not only admitted that he was the sole owner of the boat, but also that "he got six shares in addition to his own share as a member of the crew;" that no one "else participated in the profits or the distribution of the income," and that "the profits were not split with anyone else." Furthermore an admission by the defendant that he received the entire boat owner's share is implicit from the way his returns were made out.

■ These admissions, coupled with the evidence that the defendant actually owned the boat and the evidence that the owner's share of the net proceeds of its catches far exceeded the amounts reported as such by the defendant in his returns, seem to us amply sufficient to warrant submission of the Government's case to the jury.

■ The defendant contends, however, that when the court below told the jury: "Now, if you should decide that he was the sole owner of the boat, you would have sufficient evidence, it seems to me, to conclude that he was not only the owner but that he actually received the money," it committed serious prejudicial error for the reason that "In effect the court charged the jury as a matter of law that mere ownership is synonymous with actual receipt of the monies which belong to ownership." The specific contention is, of course, refuted by the words "it seems to me." But the defendant also contends that the sentence constituted an erroneous statement of law because, he says, mere evidence of ownership of an income producing piece of property "is not of itself enough to sustain the burden of proof required in a criminal case to show receipt" of the income produced by the property by the owner of it.

We do not pause to consider the validity of the general proposition advanced, for in the case at bar, as already noted, in addition to the evidence that the defendant owned the boat, we have the evidence of his admissions that he received the entire owner's share of the net proceeds of its catches. And from the context in which the sentence objected to appears in the charge we do not think the jury must have understood it as a statement of the general proposition that a mere finding of ownership standing alone would support a finding that beyond a reasonable doubt the defendant had actually received the income normally incidental to ownership. For immediately preceding the sentence objected to the court told the jury to "take into account all the matters in evidence," including the defendant's "own statement under oath when questioned by the Internal Revenue officials after he knew that he was under investigation," and in the paragraph following it the court told the jury: "Should

you reach the conclusion that he actually received the money and was the sole owner of the boat, you could bring in a conviction on each of the three counts for the years 1942, 1943 and 1944. I do not say you should. I merely say you could."

The defendant's other objections have been considered but we find them without merit.

The judgment of the District Court is affirmed.